$400



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

CEMENT MASONS' UNION LOCAL NO. 592 : CIVIL ACTION
    PENSION FUND, : NO.
CEMENT MASONS' UNION LOCAL NO. 592 :
    WELFARE FUND, : **19    5560**
CEMENT MASONS' UNION LOCAL NO. 592 :
    JOINT APPRENTICESHIP TRAINING FUND, :
GENERAL BUILDING CONTRACTORS :
    ASSOCIATION, INC. INDUSTRY :
    ADVANCEMENT PROGRAM, :
CEMENT MASONS' UNION LOCAL NO. 592 :
    POLITICAL ACTION COMMITTEE, :
CEMENT MASONS' UNION LOCAL 592 :
    OF PHILADELPHIA, PA; and :
BILL OUSEY, a Fiduciary :
2315 S. 22nd Street :
Philadelphia, PA 19145, :
    :

                  Plaintiffs, :

    v. :

PINE VALLEY CONSTRUCTION MANAGEMENT LLC :
121 Peachtree Drive :
Franklinville, NJ 08322 :
    :

                  Defendant. :

## COMPLAINT

Plaintiffs, by undersigned counsel, complain about Defendant as follows:

## JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action under 29 U.S.C.

§§ 185(a), 1132 and 1145 and 28 U.S.C. § 1367.

2.     A copy of this Complaint has been served on the Secretary of Labor and the

Secretary of Treasury of the United States by certified mail.



## VENUE

3.     Venue lies in the Eastern District of Pennsylvania under 29 U.S.C. §§ 185(a) or 1132(e)(2).

## PARTIES

4.     Plaintiff Cement Masons' Union Local No. 592 Pension Fund ("Pension Fund") is a trust fund established under 29 U.S.C. § 186(c)(5). Its Trustees are the "named fiduciary," "plan administrator" and "plan sponsor" and each is an individual "fiduciary," within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), for the Cement Masons' Union Local No. 592 Pension Plan ("Pension Plan").

5.     Plaintiff Cement Masons' Union Local No. 592 Welfare Fund ("Welfare Fund") is a trust fund established under 29 U.S.C. § 186(c)(5). Its Trustees are the "named fiduciary," "plan administrator" and "plan sponsor" and each is an individual "fiduciary," within the meaning of within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), for the Cement Masons' Union Local No. 592 Welfare Plan ("Welfare Plan"). The Welfare Fund is also known as and referenced as the "Cement Masons Local Union No. 592 Health and Welfare Fund" in the Labor Agreement(s) relating to this complaint.

6.     Plaintiff Cement Masons' Joint Apprenticeship Training Fund of Philadelphia and Vicinity ("Apprenticeship Fund" and, together with Pension Fund and Welfare Fund, "ERISA Funds") is a trust fund established under 29 U.S.C. § 186(c)(5). Its Trustees are the "named fiduciary," "plan administrator" and "plan sponsor" within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21) and "multiemployer plans" and "employee benefit plans" within the meaning of 29 U.S.C. § 1002(37), (l), (2) and (3). The Apprenticeship Fund is also known as and referenced

as the "Joint Apprenticeship Training Fund" in the Labor Agreement(s) relating to this complaint.

7.     Plaintiff General Building Contractors Association Inc. Industry Advancement Program ("IAP") is a fund established by the General Building Contractors Association, Inc. for the purpose of fostering and advancing the interest of the general building construction industry in the Philadelphia metropolitan area.

8.     Plaintiff Cement Masons' Union Local No. 592 Political Action Committee ("PAC" and jointly with the IAP, "Associations") is an unincorporated association established pursuant to 2 U.S.C. § 431 et seq. for the purpose of advancing the political interests of the members of the Union by lawfully influencing the selection, nomination, election and/or appointment of individuals for political office.

9.     Plaintiff Cement Masons' Union Local No. 592 of Philadelphia, PA ("Union") is an unincorporated association commonly referred to as a labor union and is an employee organization that represents, for purposes of collective bargaining, employees of Pine Valley Construction Management LLC ("Company" or "Defendant"), who are and/or were employed in an industry affecting interstate commerce within the meaning of 29 U.S.C. §§ 152(5), (6) and (7), 185(a) and 1002(4), (11) and (12). The Union is the authorized collection agent for PAC and IAP and is authorized to collect all monies due and owing to them, including field dues check-off.

10.    The ERISA Funds, Associations, and Union maintain their principal place of business and are administered from offices located in the Eastern District of Pennsylvania.

11.    Plaintiff Bill Ousey ("Ousey" and together with the ERISA Funds, Associations, and Union, "Plaintiffs") is a fiduciary with respect to the Pension Fund, Welfare Fund and

738713_1.docx
CM592F.35930.pl

3

Apprenticeship Fund within the meaning of 29 U.S.C. § 1002(21), Chairman of the PAC and President and Business Manager of the Union, with a business address as listed in the caption. He is authorized to bring this action on behalf of all Trustees of the Pension Fund, Welfare Fund, Apprenticeship Fund, PAC and the Union. He is trustee ad litem for the IAP in connection with this action.

12.     Pine Valley Construction Management LLC ("Company"), is an employer in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(2), (6) and (7), 1002(5), (11) and (12) with a business office or registered agent at the address listed in the caption.

## COMMON FACTS

13.     At all times relevant to this action, Defendant was party to or agreed to abide by the terms and conditions of a collective bargaining agreement(s) with the Union (singly or jointly, "Labor Contract"). A copy of the Labor Contract and Company's signature page are attached collectively as Exhibit 1.

14.     Defendant also signed or agreed to abide by the terms of the trust agreements of the ERISA Funds, as from time to time amended (jointly referred to as "Trust Agreements"), made between certain employers and employee representatives in an industry(ies) affecting interstate commerce to promote stable and peaceful labor relations.

15.     Under the Labor Contract or Trust Agreements and applicable law, Defendant is required:

        a.     To make full and timely payments on a regular basis to the ERISA Funds, Union and Associations as required by the Labor Contract;

        b.     To file monthly remittance reports with the ERISA Funds detailing all employees or work for which contributions were required under the Labor Contract;

738713_1.docx                                    4
CM592F.35930.pl

c.     To produce, upon request by the ERISA Funds individually or jointly, all books and records deemed necessary to conduct an audit of their records concerning their obligations to the ERISA Funds, Union, and Associations; and

d.     To pay liquidated damages, interest and all costs of litigation, including attorneys' fees, expended by the ERISA Funds, Union, and Associations to collect any amounts due as a consequence of the Defendant's failure to comply with its contractual obligations described in Subparagraphs (a), (b), and (c).

16.     The ERISA Funds auditors, Novak Francella LLC, attempted to conduct a payroll compliance audit of Defendant's books and records for the period January 1, 2016 through December 31, 2018. By letter dated April 17, 2019, Novak Francella LLC contacted Company to schedule a payroll compliance audit. Company did not respond to the letter.

17.     Representatives from Novak Francella LLC called Company's business phone number and left voice messages to schedule a payroll compliance audit. Company did not respond to the voice messages.

18.     By letter dated September 9, 2019, Plaintiffs' counsel mailed a demand to Company for compliance with a payroll compliance audit. The letter was sent by Certified mail to the address listed in the complaint but returned as unclaimed to Plaintiffs' counsel on October 8, 2019.

19.     All conditions precedent to this lawsuit or the relief it seeks have been satisfied.

*This space intentionally left blank*

## COUNT I - AUDIT

### PLAINTIFFS
### v.
### DEFENDANT

20.     The allegations of Paragraphs 1 through 19 are incorporated by reference as if fully restated.

21.     Defendant is obligated to permit the Plaintiffs to audit its records and to cooperate in determining the contributions due the Plaintiffs.

22.     The amount of contributions and work dues Defendant is required to pay to the Plaintiffs is based upon hours worked and wages paid to employees performing work covered by the Labor Contract.

23.     Plaintiffs are without sufficient information or knowledge to plead the precise nature, extent and amount of Company's delinquency since the books, records and information necessary to determine this liability are in the exclusive possession, custody and control or knowledge of Defendant.

24.     Computation of the precise amount of an employer's delinquency is normally achieved by an audit of the employer's books and records and/or calculated from contractually-required remittance reports submitted by the employer.

25.     Defendant is required by the Labor Contract, Trust Agreement or applicable law to permit the ERISA Funds, Union, and Associations to audit the records and to cooperate in determining the contributions due Plaintiffs.

26.     An audit of the Defendant's books and records for the period January 1, 2016, to December 31, 2018 has not been completed because Defendant has refused to provide all of the

necessary documents and information to the auditors as required by the Labor Contract, Trust Agreement, or applicable law.

27. The Plaintiffs have no adequate remedy at law because the calculation of any damages suffered as a result of the breach itself requires an audit.

28. All conditions precedent to equitable relief have been satisfied.

**WHEREFORE**, Plaintiffs ask that the Court:

(1) Enjoin the Defendant, its officers, agents, servants, employees, attorneys and all others in active concert or participation with them to permit an audit of all records under their actual or constructive control and, in the absence of records, to cooperate in alternative methods for the determination of work for which contributions are due, and

(2) Grant such other or further relief, legal or equitable, as may be just, necessary or appropriate.

# COUNT II - CONTRIBUTIONS UNDER ERISA AFTER AUDIT

## ERISA FUNDS
v.
### DEFENDANT

29. The allegations of Paragraph 1 through 28 are incorporated by reference as if fully restated.

30. Defendant has failed to make contributions to the ERISA Funds in violation of 29 U.S.C. § 1145 in a period not barred by any applicable statute of limitations or similar bar.

31. The ERISA Funds are without sufficient information or knowledge to plead the precise nature, extent and amount of Defendant delinquency since the books, records and

information necessary to determine this liability are in Defendant's possession, custody, control or knowledge.

32.     The ERISA Funds have been damaged by Defendant's violation of 29 U.S.C. § 1145.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     After an audit, enter judgment against Defendant in favor of the ERISA Funds individually for the contributions found due and owing by the audit, together with interest at the rate prescribed by 26 U.S.C. § 6621 from the due date for payment until the date of actual payment, liquidated damages equal to the greater of the interest on the unpaid contributions or liquidated damages provided by the plan document or statute and reasonable attorneys' fees and costs incurred in this action and in connection with any proceeding to enforce or collect any judgment.

(2)     Grant such other or further relief, legal or equitable, as may be just, necessary or appropriate.

## COUNT III - CONTRIBUTIONS UNDER CONTRACT AFTER AUDIT

### PLAINTIFFS
### v.
### DEFENDANT

33.     The allegations of Paragraphs 1 through 32 are incorporated by reference as if fully restated.

34.     Defendant has failed to make contributions to the Plaintiffs as required by the Labor Contract or Trust Agreements in a period not barred by any applicable statute of limitations or similar bar.

35.    The Plaintiffs are without sufficient information or knowledge to plead the precise

nature, extent and amount of Defendant's delinquency since the books, records and information

necessary to determine this liability are in Defendant's possession, custody, control or

knowledge.

36.    The Plaintiffs have been damaged by Defendant's failure to make contributions as

required by the Labor Contract or Trust Agreements.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)    After an audit, enter judgment against the Defendant in favor of the

Plaintiffs individually for the amount of contributions found due and owing by an audit together

with liquidated damages, interest and costs, including reasonable attorneys' fees incurred in this

action or the collection and enforcement of any judgment, as provided in the Labor Contract or

Trust Agreements.

(2)    Grant such other or further relief, legal or equitable, as may be just,

necessary or appropriate.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

BY:  _____
MAUREEN W. MARRA (ID No. 309865)
1835 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 351-0674
Fax: (215) 922-3524
mmarra@jslex.com / usdc-edpa-erisa@jslex.com

Date:  11/22/19                          Attorney for Plaintiffs

738713_1.docx                      9
CM592F.35930.pl

# *INDEPENDENT CONTRACTOR COLLECTIVE BARGAINING AGREEMENT*

## WITH

## CEMENT MASONS AND PLASTERERS UNION LOCAL 592

**An Affiliate of the
Operative Plasterers and Cement Masons
International Association
Of The United States and Canada**



# INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** made and entered on the date set forth below, to become effective as set forth hereinafter, by and between the **UNDERSIGNED EMPLOYER,** hereinafter referred to as "Employer", and **CEMENT MASONS AND PLASTERERS LOCAL UNION NO. 592,** hereinafter referred to as the "Union" (an affiliate of the Operative Plasterers and Cement Masons International Association of the United States and Canada).

# ARTICLE I
## PURPOSE

The purpose of this Agreement is to set out the conditions under which Cement Masons/Plasterers (including Cement Masons/Plasterer foremen) and Cement Masons/Plasterer Apprentices (all of whom are hereinafter referred to as "Employees") shall work, and under which the employer shall hire and employ such Cement Masons/Plasterers and Cement Mason/Plasterer/Apprentices.

### GOVERNING PROVISIONS

The provisions of the National Labor Relations Act as amended, the Labor Management Relations Act, 1974, rulings and regulations issued by the National Labor Relations Board or its agents, and all federal, state and municipal judicial bodies, courts and agencies having legal jurisdiction, shall govern the provisions of this agreement, its interpretation, amendment, change and every other thing in relation to its operation and enforcement.

Any provisions herein contained that are contrary to or held to be in violation of the law on the part of either party hereto by any federal, state or municipal law now in force and effect, or that may be hereafter enacted and effective, shall have no force and effect for the duration of such voidance, it being intended, however, that the remaining provisions hereof shall be unaffected.

### DURATION AND TERMINATION OF AGREEMENT

This Agreement shall first become effective on the date on which it is first executed by the parties and may only be thereafter terminated or modified in accordance with the procedures set forth in this paragraph.

The Agreement shall then initially remain in full force and effect for the remainder of the then effective collective bargaining agreement between the Union and the General Building Contractors Association. Unless terminated in accordance with the procedures set forth hereon, the Agreement shall then renew itself for such period of time as each successor collective bargaining agreement between the Union and the General Building Contractors Association.

To the extent that this agreement is thus renewed, the appropriate wage and fringe benefit contribution shall be as set forth in the attached Appendix or as modified from time to time hereafter by the appropriate master collective bargaining agreement in effect for the geographic area in which the labor is being performed, which agreement is set forth in that Appendix. In the event of such modifications, they are automatically incorporated by reference herein as if fully stated and shall be applied as of the date provided in the appropriate master agreement. In the event that a contract with any contractor association is not reached, the employer signatory to this agreement agrees to work retroactive to all monetary and rule changes.

If voluntary changes as may be desired by either or both parties for an ensuing period, such proposed changes shall be reduced to writing, and then served upon the other party by registered or certified mail that is actually received not less than ninety (90) days prior to the expiration date that is described herein. Given such timely notice, the contract shall expire as of the date described herein if no successor agreement is reached. In the absence of such timely notice, this Agreement shall continue in full force and effect for the following period of renewal, and thereafter in the absence of a similar notice.

## DEFINITION OF EMPLOYER

The term "Employer" as used herein shall also mean as follows:

(1) Any person, firm, corporation or other entity of whatsoever nature regularly engaged in the performance of work covered by this Agreement who or which at the time of execution hereof was, or any time since has become, a member of any other employer organization which executes this Agreement or any counterpart hereof, or

(2) Any person, firm, corporation or other entity of whatsoever nature regularly engaged in the performance of work covered by this Agreement who or which executes this Agreement or any counterpart hereof, or

(3) Any other person, firm, corporation or other entity performing work covered by this Agreement (unless also covered by an Agreement with the Union to which he, she or it is a party) in which any Employer as defined in paragraph (1) and (2) above, has or hereafter during the term of this Agreement, singularly or collectively, acquires, either directly or indirectly, a controlling interest.

(4) Any person, firm, corporation or other entity which joins or participates with, or in any way assists an Employer as defined above, directly or indirectly, in evading or violating the requirements of this Agreement.

## WORK PRESERVATION

In order to protect and preserve to the employees in the bargaining unit, the work covered by this Agreement, it is agreed as follows:

3

(1) Whenever an Employer performs any on-site construction of the type covered by the Agreement under its own name or any other name whether as a sole proprietorship or other unincorporated organization, or as a corporation or any other business entity, including a joint venture, wherein the Employer exercises directly or indirectly management control or ownership, the terms and conditions of this Agreement shall be applicable to all such work as that term is used in the construction industry proviso to Section 8(e) of the National Labor Relations Act.

(2) It is agreed that this Agreement shall be binding upon the Union and upon the employer, and upon any firm or corporation doing covered work, in which an employer, directly or indirectly, acquires a controlling interest.

(3) In the case of an alleged violation of this Article, the complaining party may elect to pursue his or its complaint either through the procedures set forth in this Agreement or in an action at law or in equity in a court of competent jurisdiction, or any other proceeding before a tribunal with proper jurisdiction.

The Employer warrants and agrees that it will not by the adoption of amendment of any provisions of its Articles of incorporation, ownership, or change in the geographic location of its employment office, constitution, by laws, or by contract, or by any means whatsoever, take any action that will prevent or impede it in the full and complete performance of each and every term and condition hereof.

# ARTICLE II
## JURISDICTION

This Agreement shall be binding in the territorial jurisdiction of the Union and for the work jurisdiction of the Union, including that appended as Appendix "A." The Employer further agrees that this Agreement shall be effective in any geographic jurisdiction which the Union currently possesses or that it subsequently acquires that is beyond that set forth herein in Appendix "A."

In that regard the parties recognize and agree that except to the extent as provided in the attached Appendix, this Agreement shall be applied in its entirety in all such geographic jurisdiction.

# ARTICLE III
## UNION SECURITY

**Section 1.** Employer shall have the right to secure and choose any person as a new Employee from any source, subject to this Article. It is agreed that any Employee to whom this Agreement is applicable shall, not later than the eighth day after he was hired by any Employer, or the eighth day after the execution of this Agreement, whichever is later, if he is not then

4

already a member of the Union, become a member of the Union, and that such Employee, as well as each Employee who is already a member of the Union when he is hired or when this Agreement is executed or who has voluntarily become a member prior to said eighth day, shall remain a member of the Union in good standing notwithstanding his being laid off or dismissed by, or his quitting the employ of, any Employer and his entering or leaving the employ of another Employer, and the Union shall make membership therein continuously available to such Employee on the same terms and conditions as are generally applicable to other applicants for membership in, and other members of the Union.

## DISCHARGE

**Section 2.** An Employee who fails or refuses to become a member of the union not later than the eighth day after date of his hiring by any Employer, or who loses his good standing in the Union because if failure to pay to the Union the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership in the Union, shall upon written notice to that effect from the Union to his then current Employer, be discharged by such Employer.

## QUALIFICATIONS

**Section 3.** Employers shall only employ employees who are qualified.

(a)  The following shall be considered as qualified:

> (I)  All present local Union members other than those in a sub-classification;

> (ii)  All graduates of the Apprenticeship Program administered by the Union and the various Contractors
Association;

> (iii)  All Cement Masons/Plasterers who have been members of a Local Union of the Operative Plasterers and Cement Masons International Association of the United States and Canada.

(b)  Where an Employer hires an Employee who does not fall within any of the categories listed in (a) above, such Employee shall be required to make application within a period of seven days following the beginning of such employment to take a competency examination to be administered by the Union.

Should such Employee fail to pass the competency examination, the Union shall so notify him and his Employer in writing, and after receipt of such notice he or his Employer shall be permitted five days during which to file an appeal in writing, in which event the matter shall be processed pursuant to the provisions of This Agreement.

5

If no appeal is filed within the time set forth, the Employer shall discharge such Employee. If an appeal is filed within the time set forth, the Employer may continue to employ such Employee pending final disposition of the matter pursuant to the dispute resolution procedures of this Agreement.

(c)    In the event there are available no qualified Employees, the Employer may employ or continue to employ any available individual to perform the work with the understanding that on or before the eighth day of such employment such Employee must make application for training, retraining, or a competency examination for a sub classification in keeping with his current skill. In the event such Employee fails the competency examination for such sub-classification, the Employer may nevertheless continue such individual in his employ until a qualified Employee is available.

## NONDISCRIMINATION

**Section 4.** No Employee, or applicant for employment, shall be discriminated against by reason of race, religion, age, color, sex, disability or national origin, and the parties hereto agree to comply with any and all State and Federal laws, and rules and regulations promulgated pursuant thereto, guaranteeing civil rights and liberties to all persons.

## COLLECTION OF DUES

**Section 5.** The Steward representing the Union on a job shall be allowed one hour without loss of pay each week to collect all Union dues from members and Union dues and initiation fees from Employees working on the job who have made application for membership in the Union.

**Section 6.** The employer agrees that, where a member of or applicant for membership in the Union refuses to pay or neglects to pay his said dues and or initiation fees, or fails to abide by the terms of an extension of time to make such payments, the Steward will be permitted, on the Employer's time to request the delinquent member or applicant for membership, as the case may be, voluntarily to sign an authorization form, provided by the Union, authorizing the Employer to withhold the final paycheck of such member or applicant for membership. In the event such member or applicant for membership quits, or is released at the request of the Union, such member or applicant for membership will within one week after such quit or release, either furnish the Employer with written certification from the Union that he has cleared directly with the Union all indebtedness due to the Union before receiving his final paycheck or the Employer will deduct the amount of such indebtedness from such final paycheck. The Steward will furnish the Employer with the original copy of the authorization form, retaining the duplicate for the Union.

6

In the event of any negligence on the part of an Employer in giving a member or applicant for membership his final check before his indebtedness is paid to the Union after the Employer has received such authorization to withhold such final check, such Employer will be liable for, and will pay to the Union the dues and/or initiation fees due to it from such member or applicant for membership, not exceeding the amount payable to the Employee since the Employer's last preceding regular payday.

It is further agreed that the Employer will make payment to the Union of the amount so deducted by him from the Employee's final check within one week after receiving written notice from the Union of the amount due to the Union from such Employee.

"Final paycheck" as used in this Section does not include any amount due to the Employee in reimbursement of transportation expense provided for in this Agreement.

The signature by an Employee of an authorization form as aforesaid shall not effect a waiver or modification of the rights and obligations, under Article III hereof, of the Union or of the Employer.

# ARTICLE IV
## NORMAL WORK DAY AND TIME

**Section 1.** Eight (8) hours shall constitute a day's work, time to be made between 6:00 A.M. and 4:30 P.M., Monday through Friday. Lunch period 12:00 Noon to 12:30 P.M. if worked, shall be paid at premium time.

In the event that substantially all crafts on a particular project have agreed to, or are assigned, a common starting time, Employees covered by this Agreement shall start their work day at that common starting time. A staggered starting time shall be permitted only pursuant to the explicit written agreement of the Union and the Employer, otherwise cement masons who started any pour shall finish said pour.

## WORK WEEK

**Section 2.** The work week shall consist of forty hours. Time to be made Monday through Friday.

## SHIFT WORK

**Section 3.** The Employer who desires a night shift shall make arrangements in writing with the Business Representative of the Union not less than forty-eight (48) hours in advance.

No shift work shall be permitted unless all Employees of the day shift on the same job have worked sufficient time to receive eight hours' pay. In the event that a single shift is worked in a day that is not preceded by a normal day shift and such shift is authorized by the Business Representative, each Employee shall be compensated by an additional 15% per base hour. If no authorization is obtained for such shift, it shall be compensated at premium time.

7

All straight-time work performed on the second shift shall be compensated at the rate of 10% in the excess of the base rate specified herein.  All straight-time work performed on the third shift shall be compensated at the rate of 15% in the excess of the base rate specified herein.

All night shifts shall consist of unemployed Cement Masons/Plasterers who have not been employed in the capacity of Cement Masons/Plasterers during the preceding twenty four hour period.

No shifts shall be operated on any job with less than two Employees.  Night shifts may not be worked prior to the ending of the day shift.

When two or more shifts are worked, the first or day shift shall work eight hours; the second shall work seven and one-half (7 1/2) hours starting at the end of the day shift, while the third shift shall work seven hours starting at the end of the second shift.

All Employees working on shift work shall have a minimum of eight (8) hours worked for each day or night worked, unless the Employees leave the job of their own volition.  All work performed prior to the regular shift starting time or after the regular quitting time shall be considered as overtime.

In the event that a single shift is worked in a day that is not preceded by a normal day shift, each Employee working that shift shall be compensated by an additional 15% per base hour.

Time worked between the hours of 8 A.M. on Saturday and 8 A.M. on Monday shall be paid the overtime rate.

When a night shift consists of three (3) or more Employees, one Cement Masons/Plasterer shall be designated as foreman and he shall be paid in accordance with and be subject to the terms of this Agreement.

## SWING RATE

**Section 4.**  Swing Rate shall be 15% in excess of the Journeyman rate for work performed on swing scaffolds.

## TRAVEL TIME

**Section 5.**  When Employees are sent to work outside the jurisdictional area as outlined in Article II, board shall be paid by the Employer as well as transportation fare both ways, and if traveling at night, sleeping accommodations shall be paid for.  When traveling during regular working hours, Employees shall receive the regular rate per hour, but not to exceed eight hours' pay for any one day traveling.  Travel pay shall be as provided in the attached Appendix.

## OVERTIME HOURS

**Section 6.** All time made in excess of eight (8) hours a day and before the regular hour for beginning or after the regular hour for ending of such day shift shall constitute premium time and shall be paid for at the overtime rate set forth in the Appendix. When overtime is worked on any job, all Cement Masons/Plasterers working on such job for the contractor requiring overtime work shall be eligible to work such overtime.

## HOLIDAYS

**Section 7.** Holidays to be observed are: New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. No work shall be performed on Labor Day. All work performed on any of the foregoing holidays shall be paid for at the rate of double time.

When overtime is made on Election Day, time off without pay to vote shall be allowed.

## REPORTING

**Section 8.** An Employee who reports upon the expressed order of an employer shall be guaranteed two hours work calculated at the hourly wage rate. Weather conditions, acts of God, fire, accidents, and other reasons beyond the control of the employer shall be the exception of this rule. Weather conditions must be present at starting time, if not, the 2 hours are in effect. Any employee notified before starting time is still subject to the weather condition rule.

## GUARANTEED EIGHT HOUR PAY

**Section 9.** If an employee starts work, that employee shall be guaranteed a minimum of eight hours' pay for that day. This guarantee shall be inapplicable in the event that work is discontinued due to weather conditions, act of God, fire, accidents and other reasons beyond the control of the employer, in which case the Employee will be paid for hours actually worked; provided, however, whenever an Employee starts working in foul weather for an Employer, the eight hours' pay guarantee shall be in force and effect. It is mutually agreed that a Cement Mason/Plasterer may be moved from job to job by the same Employer during the work day at not cost to the Cement Mason. An employee who was referred to the Employer by the Union hall shall have first preference for the payment of the eight hour guarantee.

9

## STARTING TIME

**Section 10.** All employees shall be on the job site with tools ready to start at the designated starting time. At lunch periods they shall not be required to leave the tool house until one-half hour has elapsed from time of quitting for lunch.

## LAYOFFS

**Section 11.** If an Employer or foreman discharges or lays off any Employee, such Employee shall, subject to the provisions of this Agreement, be paid at once. The Employer's failure to pay such employee at time of discharge or layoff shall result in the Employee's entitlement to the receipt of two (2) additional hours of pay for each day that such payment is delayed until actually received.

Payment for overtime on day of layoff must be postmarked no later than the next working day. Failure to do so will result in two additional hours of pay for each day that such payment is delayed until actually received.

Unless Employees are relieved of their duties and formally laid off, all time spent on the job due to interruptions of production, weather conditions and the like shall be considered as working time.

Notice of layoff shall be given to the Cement Masons/Plasterers on the job at least 60 minutes before quitting time by the Employer, the superintendent, or, if there be such person on the job, by the Cement Mason's/Plasterer's general foreman or foreman.

If a discharged or laid-off Employee's wages are not paid during regular working hours, that Employee shall receive an additional two (2) hours' waiting time for each day that such payment is delayed until actually received.

**Section 12.** When layoffs are caused by the delay of work of the Employer, the Employees shall be paid upon demand. If an Employee reports for work in the morning, or at such time as he may have been instructed the evening before, and he is not put to work, except for conditions beyond the control of the Employer, such as weather, etc., he shall be guaranteed two hours' work.

**Section 13.** When an Employer reduces the number of Employees in his shop, the Employees shall be laid off in the inverse order of their employment. This order of employment reduction shall be maintained unless mutually agreed by the Employer and Union Representative.

**Section 14.** When Employees are ordered to leave the job for any reason by the supervisor or Employer, the Employees shall not return on the job until the regular starting time the following day. If an Employee is laid off or discharged after being ordered to leave the job, that Employee shall be entitled to receive two (2) additional hours of compensation. If an employee is scheduled for work and is told not to report after the end of the preceding work day two (2) additional hours of pay is required.

## TOOL HOUSES

**Section 15.** Tool houses, which shall be adequately heated during cold weather, shall be located in a convenient place. In no case, however, shall Employees be required to spend more than five minutes to travel from tool house or checking-in place where working, or to spend more than the same amount of time in returning to the tool house or checking-out place.

Suitable drinking water shall be provided for the bargaining unit at all times. Ice water shall be provided during the months of May, June, July, August, September and October, in sanitary container. Paper drinking cups shall be furnished by the Employer.

**Section 16.** If any Employee should become incapacitated because of illness, or as the result of an accident incident to employment, such Employee shall be re-employed upon the same project upon his recovery, provided he returns to work within a reasonable length of time, which shall be not more than five (5) working days after his recovery. If requested, the Employee shall furnish a doctor's certificate to establish the date of his recovery.

Any employee who leaves the job because of an injury suffered on the job, or because of a job related illness, shall receive pay for a full day's work regardless of when he has left the job as aforesaid.

**Section 17. Tools.** Employees shall carry all standard hand tools pertinent to their trade. Any special tools required shall be furnished by the Employer. When working in foul weather, foul weather gear will be furnished by the Employer.

**Section 18. Tools and Clothing Storage.** All employers shall provide a safe place under lock and key for the use of the Employees in storing their tools, and making the necessary changes in clothing, the steward and foreman to be supplied with the keys and locks. The Employer shall reimburse, either directly or through insurance, any Employee up to a maximum of $100 for tools and or $50.00 for clothes which are destroyed by fire or other act of God, or while the project is not operating which are lost, stolen, destroyed or damaged; provided, however, that this provision shall only apply if such destruction or damage occurs while such tools and/or clothes are in the tools shed or tool room; and provided further that the Employees shall promptly furnish the Employer with a properly sworn statement of loss.

**Section 19. Salamanders.** When salamanders or other devices that give off injurious fumes are used, they must be properly ventilated.

**Section 20. Scaffolding.** The provisions of the Federal and State Safety Code of the Department of Labor in which the labor is being rendered shall be observed.

**Section 21. Safety Regulations.** Employees and Employers shall comply with all safety measures required under City, County, State and Federal Department safety rules and regulations.

11

# ARTICLE V
## FOREMEN

**Section 1.** All foremen shall be qualified Cement Masons/Plasterers. Employees shall not be required to receive orders from anyone other than a practical Cement Mason/Plasterer.

**Section 2.** When two (2) or more Employees are employed, one shall be designated as a foreman.

**Section 3.** Notice of layoff shall be given to the Cement Masons/Plasterers on a job at least 60 minutes before quitting time by the Employer, the superintendent, or, if there be such on the job, by the Cement Mason's Plasterers' general foreman or Cement Masons/Plasters' foreman.

# ARTICLE VI
## APPRENTICES

**Section 1.** Continuing throughout the term of this Agreement, the Employer hereby agrees to be bound by the provisions, as they may from time to time be amended, of an Agreement and Declaration of Trust between the various Contractors Association, and the Union establishing the Plasterers and Cement Masons Joint Apprenticeship Training Funds or whatever name may be adopted for said Fund, and by the provisions, as they may from time to time be amended, of the Standards of Apprenticeship established pursuant to said Agreement and Declaration of Trust.

**Section 2.** Continuing throughout the term of this Agreement, the Employer shall contribute to said Joint Apprenticeship Training Fund at the appropriate rate set forth in the attached Appendix. Cents for each hour worked for which wages or compensation (including compensation for reporting time and paid holidays) are payable to any Employee performing work covered by the terms of this Agreement.

**Section 3.** Any bond, deposit or security posted by the Association, by an Employer or by any other Employer, pursuant to the provisions of this Agreement shall also guarantee and be applicable to the fringe benefits contributions to be made pursuant to this Article.

**Section 4.** The wage rates of apprentices shall be as set forth in the attached Appendix.

**Section 5.** Subject to their availability and to job conditions as determined by the Union Business Representative in his sole discretion, every fifth employee covered by this agreement on each job site shall be an apprentice.

**Section 6.** There shall be, at the union's discretion, a new classification of cement masons. The new classification shall be known as a "B Mechanic". B mechanics shall be new members of Local 592 who fall between Journeyman and Apprentices. B mechanics shall be paid starting at 60, 70 or 80% of the Journeyman rate. He also shall attend 2 years of training at the Apprentice Training Center. All above shall be at the discretion of the Business Manager. All B mechanics shall be referred through the union office only.

12

# ARTICLE VII
## WAGE RATES

**Section 1.** The minimum hourly wage rate for Cement Masons/Plasterers shall be determined in accordance with the geographic area in which the labor was rendered and shall be as set forth in the attached Appendix.

## HAZARDOUS WORK

**Section 2.** On hazardous waste removal work, on a state or federally designated hazardous waste site, where the Cement Mason/Plasterer is in direct contact with hazardous material and when personal protective equipment is required for respiratory, skin and eye protection, the Cement Mason/Plasterer shall receive the hourly wage plus an additional twenty percent (20%) of that wage.

## OVERTIME RATES

**Section 3.**
a. The overtime premium shall be determined in accordance with the geographic area in which the labor was rendered and shall be as set forth in the attached Appendix.

# ARTICLE VIII
## METHOD OF PAYING WAGES

**Section 1.** Subject to the provisions of this Article, Employees shall be paid on the job no later than the end of the regularly-scheduled pay day. When Employees are obligated to wait for their wages to be paid by their Employer, such waiting time shall be paid at straight time rate of pay to a maximum of eight hours per calendar day (including weekends) until said monies are actually received by the Employee. This sentence shall not apply to the withholding of the final paycheck pursuant to the provisions of this Article. Wages shall be paid in United States currency unless suitable arrangements are made for the expeditious cashing of checks by Employees at no expense to them.

**Section 2.** An itemized statement bearing the name of the Employer shall be included in pay envelope or upon check stub. Said statement shall show gross income, deductible items, the name and address of the Employer, the signature of an authorized representative of the Employer and the net amount. This statement or check stub to be retained by Employee.

**Section 3.** In addition to any other provision of this Agreement, an Employer shall pay a Twenty-Five Dollar ($25.00) fee to each employee for each paycheck that cannot be cashed or is returned due to insufficient funds.

# ARTICLE IX
## STEWARDS

**Section 1.  Duties of the Steward.**  The Union shall appoint a Steward for each job.  The Steward shall examine all working cards at such times as he deems necessary.  He shall be permitted a reasonable time to perform his duties.  The Steward shall be the last employee to be laid off.

**Section 2.**  It shall be the duty of a steward to record and report to the proper agent of the Employer all injuries and accidents.  He shall remain with any victim of an injury until professional care is available.

**Section 3.**  The duties of a steward shall include the notification of the Business Representative of any work that is not performed in a workmanlike manner.

**Section 4.**  A steward may endeavor to adjust grievances, if possible, but shall not take upon himself the obligation to stop work or strike a job because of a grievance.  He shall notify the Business Representative of the existence of a grievance and be guided by his advice and instruction.

# ARTICLE X
## BUSINESS REPRESENTATIVES

**Section 1.**  Business Representatives of the Union shall be allowed to visit on the job at any time, provided there is no interference with Employees doing their work.

**Section 2.**  The Employer shall provide the Business Representative of the Union with the names and hours worked of Employees, if requested.

# ARTICLE XI
## HEALTH AND WELFARE FUND AND INDUSTRY ADVANCEMENT PLAN

**Section 1.**  The Employer shall, on or before the tenth day following the end of each payroll week, pay to the Cement Masons Local Union No. 592 Health and Welfare Fund, or to such other fiduciary as shall be from time to time designated by the Union (any of which is hereinafter referred to as the "Depository" or "Trustee"), a sum for each hour (whether regular time or overtime) for which wages or any type of compensation payable (under this Agreement) are payable during such payroll week to any employee, as the term Employee is defined in this Agreement.  Each such hour is hereinafter referred to as an "hour worked."  Their hourly sum shall be determined in accordance with the geographic area in which the labor was rendered and shall be as set forth in the attached Appendix.

14

**Section 2.**  The Health and Welfare Fund shall be administered and maintained pursuant to an Agreement and Declaration of Trust between the Union and the Contractor Associations as stated in Appendix B to which the Employer assents to be bound and well as to all amendments or modifications thereto that may hereafter be made by the parties.

**Section 3.**  The Employer shall contribute to the Industry Advancement Program as herein established an amount for each hour worked by each Journeyman (including foreman) and apprentice employed by said employers.  Said contribution shall be made in the same manner and time as the employer's contribution to the Health and Welfare Fund as heretofore provided herein. The sum to be thus contributed shall be determined in accordance with the geographic area in which the labor was rendered and shall be as set forth in the attached Appendix.

# ARTICLE XII
## PENSION FUND

**Section 1.**  the Employer shall, on or before the tenth day following the end of each payroll week, pay to the Cement Masons Local Union No. 592 Pension Fund, or to such other fiduciary as shall be from time to time designated by the Union (any of which is hereinafter referred to as the "Depository" or "Trustee"), a sum for each hour (whether regular time or overtime) for which wages or any type of compensation payable (under this Agreement) are payable during such payroll week to any employee, as the term Employee is defined in this Agreement.  Each such hour is hereinafter referred to as an "hour worked."  The hourly sum shall be determined in accordance with the geographic area in which the labor was rendered and shall be as set forth in the attached Appendix.

**Section 2.**  The Pension Fund shall be administered and maintained pursuant to an Agreement and Declaration of Trust between the Union and the various Contractors Association as stated in Appendix B to which the Employer assents to be bound and well as to all amendments or modifications thereto that may hereafter be made by the parties.

# ARTICLE XIII
## DELINQUENCY AND COLLECTION PROCEDURE

**Section 1.**  The provisions of this Article shall apply with equal force and effect to the obligations set forth in this Agreement regarding contributions to the Joint Apprentice Committee, the Health and Welfare Fund, the Industry Advancement Plan, the Pension Fund, the Field Dues Check-off and the Political Action Committee.

**Section 2.**  All payments shall be remitted to the depository designated herein on Report Forms designated, as appropriate, by the funds or Union.  In the event that the remittance report accompanying any payment made to the Depository shows that the full sum as therein required is not paid, or is not intended to be paid, then the Depository shall dispose of said payment by distributing to each party such portion of the remittance in proportion to the fraction that each such recipient's hourly remittance bears to the total hourly remittance required by this Agreement.

15

**Section 3.** To the extent that an employee has not performed Covered Employment during the reporting period, the Employer shall so advise the Funds of that fact in the time and by the method other wise provided for the remittance of contributions herein.

**Section 4.**
**(A).** Except as otherwise specifically provided herein, payments not received by the 10th day following the payroll week which the Report covers shall be considered "delinquent" for purposes of this Agreement.
**(B).** If the Trustees of the respective Funds, in their sole discretion, determine that an Employer has a satisfactory record of timely payments, the Trustees may notify such Employer in writing that his payments into the respective Funds will be required by the 15th day following the end of each calendar month, which shall be the "Due Date."

**Section 5.** Payments received by the Fund or Union after the due date shall automatically incur and shall include a liquidated damages charge equal to ten percent (10%) of the gross amount due each Fund or Union if submitted after the due date.

**Section 6.** In addition to the liquidated damages charge provided for above, the alleged failure of the Employer to make payments when due or payments received after the due date shall subject the Employer to one or more of the following actions:

**(A).** As otherwise described in this Agreement, the Union shall have the right to withhold employees covered by this Agreement until all sums due (including liquidated damages) are paid. If such action shall, in the discretion of the Union, prove necessary or desirable, the employees whose labor is thus withheld, shall be paid their wages and fringe benefits for all time lost pending payments by the Employer as provided in this Agreement.

**(B).** The appropriate Funds and/or Union may institute formal collection proceedings that may include, but are not limited to the institution of legal action against the Employee, to secure, and if necessary, to compel payment of the monies described herein. In the event that an Employer is delinquent in the payment of contributions, the Employer shall pay (in addition to the principal sums due and the ten percent (10%) liquidated damages) interest calculated in accordance with ERISA, all costs of suit (including reimbursement for Fund administrative time) and attorneys' fees and costs, regardless of whether suit or other formal proceedings are instituted.

**(C).** The Employer shall also be responsible for all claims paid by the Health and Welfare Fund on behalf of all employees on whose behalf contributions are due during the pendency of the delinquency, regardless of whether the delinquency is ultimately paid.

**Section 7.** The Employer shall, simultaneous with the remittance of monies described

herein, transmit to said Depository, a report containing (1) the names and Social Security numbers of the persons to whom this Agreement is applicable, who have been in the employ of the Employer during such payroll week; (2) the number of hours during said payroll week for which wages or any type compensation are payable under this Agreement; and (3) such other payroll information as the Boards of Administration of the Funds herein provided for may reasonably require for the proper administration of said Funds.

### Section 8. Surety Bonds.

(A). The payments to be made and, where appropriate, monies to be withheld, as provided in this agreement to the Joint Apprentice Committee, the Health and Welfare Fund, the Industry Advancement Plan, the Pension Fund, the field Dues check off and the Political Action Committee shall, in addition to the other remedies provided herein, be guaranteed and secured by requiring the Employer to guarantee or secure the faithful making of such payments by the deposit of Thirty Thousand dollars (\$30,000.00) in cash with the Trustee or by the Bond of a recognized and responsible corporate surety.

(B). Such Employer shall upon certification to him and to the Union by the Trustee, that such employer or other employer is in default in the payments required of him by this Agreement, furnish further corporate surety to assure payments required under this Agreement by such Employer to an amount of Thirty Thousand dollars (\$30,000.00) over and above the amount of such payments in default, or, in the alternative, shall deposit with the Trustee as collateral security for the faithful performance of his own Bond assuring said payments, a further amount in cash or in securities acceptable to the Trustee, sufficient to restore such collateral security to an amount of thirty Thousand dollars (\$30,000.00).

**Section 9.** Prior to entering into any subcontract for work covered by this Agreement, the Employer will verify with the Fund that the proposed subcontractor has a signed Agreement and has posted the fringe benefit bond required under this Agreement. After the employer has contacted the Fund, the fund will inform the Employer in writing within 72 hours if the proposed subcontractor does not have a fringe benefit bond, and/or an Agreement. The employer will not enter into a subcontract until the subcontractor has posted a bond and signed an Agreement. The failure of the Employer to comply with this Section 9, will require the Employer to be primarily responsible for all Wages and Fringe Benefits of a sub-contractor who does not have a Bond and/or Agreement with the Union.

The Employer agrees that, upon written notice from the Fund that its subcontractor is delinquent in the payment of fringe benefits on his particular project, the Union, the subcontractor, and the Employer shall meet to resolve said delinquency. In the event that satisfactory arrangements to collect the delinquency are not made, a jointly payable check in the amount of said delinquency shall be issued to the Funds by the Employer. This will not preclude the Union from exercising its rights provided in Article 14.

**Section 10.** Estimated payments in advance for all payments (except wages) required

17

under this Agreement will be made by the Employer if it has failed to demonstrate in the sole and exclusive judgment of the Union, a current record of timely payments with the Funds.

**Section II.** The Employer shall also, upon request of any agent or designee of the Funds of Union, permit such agent during regular business hours to inspect and make copies of any and all records of the Employer, including but not limited to those records pertaining to compensation paid to employees, federal tax returns, unemployment compensations returns and other records, disbursements journals of any nature and all other records of any nature or character whatsoever (including those of any individual who the Fund or Union believes may be subject to the Employer's contributory requirement) potentially relevant, in the judgment of the agent described herein, before to, and of assistance in determining whether the Employer's obligations hereunder to make payments to the Depository have been faithfully performed. If such inspection and/or audit reveals the Employer failed to make such payments in full, the Employer shall be required to pay for the cost of such inspection and/or audit at the rate of at least One Hundred Dollars ($100.00) per day or the actual cost thereof, whichever is greater, as well as any additional monies provided for herein.

# ARTICLE XIV
## SUBCONTRACTING OF JOB-SITE WORK

The Employer agrees that he will not subcontract any work which is covered by this Agreement that is to be done at the site of any job to which this
Agreement is applicable, except to a contractor bound by the terms of this Agreement, or to another Agreement with this Union.

# ARTICLE XV
## DISPUTES

**Section 1.** The following shall be the procedure to be followed with respect to all disputes of any nature whatsoever which may arise between the parties hereto or their individual members:

(a). If the dispute affects or arises on a particular job or operation, an attempt shall be made to settle it by discussion between the Foreman and or the Superintendent on the job or operation and or the Union's Business Representative for the area in which the job or location is located, on the other hand.

(b). If the discussion provided for in paragraph (I) above is not held, or if it does not result in a prompt settlement of the dispute, an attempt shall be made to settle the dispute by discussion between the Employer and/or the Superintendent on the job or operation, on the one hand and the President of the Union and/or the Business Representative aforesaid, on the other hand.

**18**

(c).   If the discussion provided for in paragraph (ii) above does not result in a prompt settlement of the dispute, or if the dispute affects or involves more than one job or operation, an attempt shall be made to settle the dispute by discussion between the President of the Union, or his designee, on the one hand, and the principal officer of the Employer, or his designee, on the other hand.  If such discussion does not result in a prompt settlement of the dispute and either Union or the Employer desires further action respecting such dispute, such further action shall be arbitration in the manner hereinafter set forth.

(d).   The Union or the Employer, whichever decides that there shall be further action on the dispute, shall notify the other in writing by registered mail of its intention to submit the dispute to arbitration, and shall, simultaneously, file with the American Arbitration Association a written demand for arbitration of said dispute, whereupon an arbitrator shall be appointed in accordance with the then prevailing rules of the Voluntary Labor Arbitration Tribunal of said American Arbitration Association.

(e).   The arbitrator thus appointed shall hold hearings as promptly as may be and shall render his award in writing and such award shall be final and binding upon the Union and the Employer and upon their respective principals or members.  The arbitrator's fees and expenses and the fees of the American Arbitration Association shall be shared equally by the Union and the Employer.

(f).   In the event that the Arbitrator shall determine that either party acted in bad faith with regard to the facts underlying the issues or with regard to the conduct of the proceedings, the Arbitrator is empowered to assess all or a portion of the fees and expenses incurred in the presentation of the case and reasonable attorneys' fees as an element of damage.  Furthermore, should the Arbitrator direct a financial remedy, such remedy shall commence to run from the date of the violation and shall be an interest rate from that date equal to the six (6) month United States Treasury bill rate, adjusted for each calendar quarter that such remedy is payable, as in effect from the date that the violation occurred to the date that payment is made.

**Section 2.**   Except as is otherwise provided in this Agreement, no dispute, disagreement of question, shall result in any strike, slowdown, stop page or abandonment or lockout.

**Section 3.**
(a)  Anything to the contrary herein before contained notwithstanding, Section 2 of this Article shall be inoperative and shall be of no effect, the Union may elect to withhold labor, with respect to claims or disputes arising out of an alleged failure by an Employer to comply with any of the provisions of this agreement relating to contributions to the Joint Apprentice Committee, the Health and Welfare Fund, the Industry Advancement Plan, the Pension Fund, the Field Dues, Check-off Collection and Delinquency Procedure and the Political Action Committee or relating to the

19

provisions of this agreement regarding either the participation in, or recognition of the finality of, the arbitral settlement of disputes set forth above in this Article.

(b). Irrespective of whether the Union exercises the election granted to it by the foregoing section to waive utilization of the disputes procedures contained herein, the Union may, in the event of a claim of dispute such as mentioned in said Section 2(a), treat as a breach of this Agreement the alleged failure by an Employer to comply with any of the provisions of this collective bargaining agreement regarding contributions to the Joint Apprentice Committee, the Health and Welfare Fund, the Industry Advancement Plan, the Pension Fund, the Field Dues Check-off and the Political Action committee or compliance with the Collection and Delinquency Procedure or of any of the provisions of Article IX of this Agreement hereof, and instead, by reason of such failure, persuades or directs Employees covered by this Agreement not to accept employment by, or to cease rendering any further service to such Employer, then the delinquent Employer shall pay the wages and the fringe benefit contributions of such Employee or Employees who cease to render any further service to, or refuse to accept employment by, such Employee or employees who cease to render any further service to, or refuse to accept  employment by, such delinquent Employer or other delinquent Employer, until such time as the delinquent reports and/or payments, if due, have been made.  In no event shall such wages or fringe benefit contributions be paid to those Employees who were not employed at the time of such refusal to render further service or refusal to accept employment.  Such persuasion or direction by the union to the Employees, and the cessation of work, or the refusal to accept employment, by the Employees shall not be deemed to be a violation of this or any other Article of this Agreement.

**Section 4.**  The parties recognize and agree that the obligations set forth in Article I and XIV are of central importance with respect to the maintenance of their relationship and that violations of those obligations would significantly and adversely affect the legitimate interests and rights of the Union and of the bargaining unit.  Moreover, the parties further recognize and agree that because the damages flowing from such violations would be difficult to quantify in actual dollar damages, the arbitrator is hereby instructed, in addition to any other from of relief, to assess such financial damages flowing from each and every violation of any obligation contained in Articles I and XIV as follows:

A.

Liquidated damages payable to the Union in the amount of $2,500 for each day on which such violation occurred on each job or project whose total contract value to the employer herein is less than $50,000 and $5,000 for each day on which such violation occurred on a job or project whose total contract value to the employer herein is greater than $50,000; and

B.

The monies that would have been paid to the Funds, including interest, liquidated damages and attorney's fees incurred in the claim to recoup same, for each hour that bargaining unit members were deprived of work opportunity.

# ARTICLE XVI
## MISCELLANEOUS

**Section 1.**  Any other Employer employing Cement Masons/Plasterers and/or apprentices within the territorial jurisdiction covered by this Collective Bargaining Agreement may become a party hereto and be bound by the provisions hereof, without becoming a member of the Association, by the execution of an undertaking to that effect.

# ARTICLE XVII
## FIELD DUES CHECKOFF

**Section 1.**  Effective May 1, 1994, each Employer shall deduct from the wages of all Employees who are covered by this Agreement and who have signed and delivered to the Employer proper legal authorization for such deductions, a working dues check-off in the sum as certified by the Union as being due and owing by the employee for each hour worked (whether regular time or overtime).  Should such sum result in a fraction of a cent, the fraction shall be increased to the next higher full cent.  The amount per hour to be deducted for dues check-off shall be shown the Employers' reporting form as cents per hour as computed in accordance with the above.

**Section 2.**  Each such Employer shall, within ten (10) days after the end of each payroll week, transmit to the Depository, as provided in herein, amounts deducted during such payroll week, together with the Employers' report of said deductions, which report shall be on the same form as is used by the employer for reporting payments due by the Employer as contributions made pursuant to this Agreement to the Health and Welfare and Pension Funds.  The payments required by this article shall be subject to all of the provisions of this Agreement regarding the collection of fund contributions.

**Section 3.**  Any Employee  who loses his good standing in his Local Union by reason of his failure to tender the Local Union periodic membership dues and or initiation fees uniformly required, or who is in arrears in the payment of field dues to the Local Union, shall upon written notice to that effect from the Local Union to the Employer, be discharged.

# ARTICLE XVIII
## POLITICAL ACTION COMMITTEE

**Section 1.**  The employer shall deduct from the wages of all Employees who are covered by this Agreement and who have signed and delivered to the Employer proper legal authorizations for such deductions, a contribution to the Cement Masons Local Union No. 592 Political Action Committee in the amount as certified by the Union as having been voluntarily contributed by the employee.

21

**Section 2.** The Employer shall, within ten (10) days after the end of each Payroll Week, transmit to the Depository as defined in this Agreement amounts deducted during such Payroll Week pursuant to this Article, together with the Employer's report of deductions, which report shall be on the same form as is used by the Employer for reporting payments due by the Employer as contributions made to the Health and Welfare and Pension Fund.

# ARTICLE XIX
## LABOR SAVING MACHINERY

There shall not during the life of this Agreement be any restriction on the use of machinery or labor saving devices used in the work covered by this Agreement. If any machinery or labor saving devices are used (such as a laser screed, paving machine, etc.), same shall be furnished by the Employer and operated by the Employees pursuant to the terms of this Agreement.

# ARTICLE XX
## MANPOWER

The number of cement masons on any pour shall be determined by the Business Manager and/or agents.

# ARTICLE XXI
## ALCOHOL AND DRUGS

**Section 1.**
Employees or applicants for employment (hereinafter "employees") who possess "illegal drugs" on the job site, except for medication prescribed by the employee's physician or over-the-counter medication, and employees functionally impaired from performing their duties due to "illegal drugs" may be barred from the job site subject to the terms below. As used herein, the term "illegal drugs" means any chemical substance whose (1) manufacture, use, possession or sale is prohibited by law; and (2) any legally-dispensable controlled substance (medications available only as prescribed by a licensed physician) obtained fraudulently or used by any individual other than the person for whom prescribed.

**Section 2.**
An employee on the job site may be required to submit to a chemical test which demonstrates on-site impairment if a reasonable, objective basis exists to believe that the employee is impaired on the job site. A "reasonable, objective basis" will exist under the following circumstances:

(A). A first hand observation is made of the employee's job performance, and documented in writing prior to any tests; and

(B). The employee's conduct or actions indicating alleged impairment shall be observed and documented in writing by two supervisors on the job site; and

(C). A determination is made that the employee's conduct is symptomatic of drug impairment by a physician or health care professional qualified to make such a determination following a consultation with the employee.

22

Persons refusing to submit, under the aforementioned circumstances, to a test which complies with the minimum procedural guidelines set forth below may be barred from the job site subject to the terms below.

**Section 3.**

An employee determined to be impaired from drugs on the job site, as a result of properly implemented medical tests described in this Agreement, will, on first occurrence, be offered the opportunity to enter a rehabilitation or counseling program from a list of local programs provided by the Union from which the employee may choose. If the employee enters such a program, his status as an employee will not be affected and he will be allowed continued access to the site under the conditions established by the program.

**Section 4.**

For purposes of this Agreement, being "impaired from illegal drugs" means the chemical tests results demonstrate on-site functional impairment in accordance with the consensus of the scientific community and at a metabolic levels accepted by the scientific community show or infer functional impairment.

**Section 5.**

The affected employee shall be advised of positive results by the employer's medical personnel and have the opportunity for explanation and discussion prior to the reporting of results to the Employer, if feasible. The affected employee shall have the right to have his/her sample independently retested by a laboratory of his/her choice at his/her expense. If the independent retest indicates that the specimen does not contain levels of substance in violation of the standards set forth herein, the employee shall be put back to work immediately with reimbursement of the tests, cost and full back pay and benefits.

**Section 6.**

Employees taking prescription medication which according to their physician has physical or medical side effects which could cause impairment on the job site should report the medication to the employer's authorized medical personnel for the site. This information shall remain strictly confidential between the employee and the medical personnel. The medical personnel shall in turn disclose any possible limitations on the employee's abilities to the Employer, who after conferring with the Union shall make reasonable accommodations for those limitations. The medical personnel shall adhere to the American Occupational Medical Association's Code of Ethical Conduct for Physicians Providing Occupational Medical Services (adopted by the Board of Directors of AOMA on July 23, 1976) and to the AOMA Drug Screening in the Work Place Ethical Guidelines (adopted by the Board of Directors of AOMA on July 25, 1986).

**Section 7.**

Any information regarding the test results will be held in strictest confidence by the Employer. Neither the Employer nor any of its medical personnel, supervisors or other personnel shall disclose any information regarding the fact of testing or the results of testing of any employee to the Owner or to any other employer or employee.

**23**

**Section 8.**

The rules and requirements contained in this Agreement shall apply to management and supervisory personnel to the same extent as other employees.

**Section 9.**

No employee shall be required to sign any waiver limiting liability of employer, owner/client, testing lab or any person involved in the chain of custody of the specimen nor any consent abrogating any provision of this Agreement.

**Section 10.**

The Union is not responsible for ascertaining or monitoring the drug-free status of any employee or applicant for employment.

**Section 11.**

The employer shall provide training to all management, security and supervisory personnel who have responsibility for the oversight of employee activities or work performance, in the recognition of impairment from drugs and work place materials or substances that may cause physical harm or illness. Such training will include the observation, documentation and reporting skills necessary for compliance with this Policy, and procedures and methods for work place substance evaluations and analysis.

**Section 12.**

All employees, upon hire, shall receive instruction in, and a copy of the policies and rules applicable to their employment and work assignments prior to access to the project.

**Section 13.**

The Employer shall establish and implement a program that assures that all managers, supervisors and employees are instructed in any changes in the existing procedures and methods.

**Section 14.**

Subject to the restrictions on medical tests contained in the Agreement, bodily fluids such as blood and urine samples shall be handled in the following manner:

(a)     Collection shall be by a physician or health care professional. Specimen containers shall be labeled with a number and the donor's signature and shall be closed with a tamper-proof seal initialed by the donor and collecting agent. The labeling shall be done in the employee's presence and in the presence of a Union representative if the employee chooses.

(b)     The specimen number and identifying information on the donor shall be entered on a log and signed by the collecting technician in the presence of the employee—and that of a Union representative if the employee chooses—and the employee shall initial the proper line on the log entry.

24

(c)     The volume of such sample shall be such that sufficient amounts will remain for both confirmation tests and independent testing.

(d)     Samples shall be stored in a scientifically acceptable manner.

(e)     All handlers and couriers of the sample must complete entries and identify themselves on a proper chain of custody form.

(f)     Confirmation tests by an alternative scientific method must be performed. After testing and confirmation testing, the facility must retain a sufficient portion of the sample for independent retesting and store that portion in a scientifically acceptable, preserved manner for thirty (30) days--unless the employee or the Union requests an extension of time.

(g)     Results shall be communicated in writing to the Employer's medical personnel within seventy-two (72) hours. The laboratory may only report drug concentrations if the appropriate test indicates that the specimen contains levels of substance(s) in violation   of   the standards established by this Agreement. Information on test results and the fact      of testing shall be communicated only to those who must know the information in order to ensure safety and enforce the Agreement's rules. Copies of all documents--including  but not limited to test results, computer printouts, graphs, interpretations, and chain of          custody forms--shall be delivered to the donor.

(h)     On the day that the sample is taken, the Employer may send the employee home for the remainder of the day, but shall arrange transportation at its expense and not allow the employee to drive home.

## STIPULATION

In signing this stipulation, the undersigned [employer] [employer association on behalf of its members] [union] agrees to be bound by all the terms and provisions of the Agreement establishing procedures for the resolution of jurisdictional disputes in the construction industry know as the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry. In particular, the undersigned agrees to abide by those provisions of the Plan requiring compliance with the decisions and awards of the Administrator, arbitrators or National Arbitration Panels established under the Plan, and to fulfill the obligations set forth in the Agreement.

This stipulation shall run for the term of the Agreement and shall continue in effect for each year thereafter unless specifically terminated effective upon the anniversary date of said Agreement, in accordance with the notice provisions contained in the Agreement. The effective date of this stipulation shall be the date it is received in the Plan Administrator's office.

### APPENDIX "A"
### JURISDICTION
### AGREEMENT

Entered into between the United Brotherhood of Carpenters and Joiners of America and the Operative Plasterers and Cement Masons International Association of the United States and Canada, at the Headquarters of the first named organization, Carpenters Building, Indianapolis, June 13, 1944.

This Agreement, entered into by and between the United Brotherhood of Carpenters and Joiners of American and the Operative Plasterers and Cement Masons International Association of the United States and Canada in the matter of Jurisdiction to govern the fabrication and setting of screeds and forms used in connection with the placing and finishing of cement or concrete, shall be as follows:

1. The setting of screeds of lumber, metal or other materials to determine the proper grade of concrete, when used to serve as forms, such as 2"x4"'s, or other plain pieces of material, when held in place by stakes and/or spreaders shall be done by Cement Masons, members of the O.P. & C.M.I.A.

A screed is a strip of wood or metal used as a guide for leveling or grading a concrete floor, slab or sidewalk.

2. The fabricating of all screeds and stakes, for any purposes, and the construction and setting of all forms shall be done by carpenters, members of U.B. of C.& J. of A.

A form is a buildup section of wood, metal or composition board used for the purpose of molding concrete to a given line or shape.

3. Any bulkhead that is one single board in height and that has no key attached or which is not notched or fitted shall be set and braced is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete. Any bulkhead that must be notched or fitted, or which has a key attached, or which is over one board high, or any bulkhead that is not used as a screed, shall be fabricated and set by carpenters.

For the U.B. of C. & J. of A:    For the O.P. & C.M.I.A.:

**M.A. Hutcheson,**    **John E. Rooney**
First General Vice-President    General President

**John R. Stevenson,**    **John J. Hauck**
Second General Vice-President    First Vice-President

## CEMENT MASONS JURISDICTION

1. All concrete construction, including foremanship of same, such as buildings, bridges, silos, elevators, smoke stacks, curbs and gutters, sidewalks, street and roads pavings, alleys and roofs, of mass or reinforced concrete slabs and all flat surfaces of cement, rock asphalt, the laying, spreading and finishing of all types of bituminous concrete including all types of asphalt floors and pavements. All types of portland based, epoxy based, gypsum based or polymer based, etc. materials used on all types of new and restoration application. The operation and control of all types of Vacuum Mats used in drying of cement floors in preparing same for finish, the operation of power driven floats and troweling machines be that of the Cement Masons. Mastic flooring, whether laid free-handed as in precast forms on the job, otherwise known as asphalt or mastic tile, and all other types of resilient floor construction, using any color pigment when mixed covering, the finishing or washing of all concrete with cement in any other form mosaic and nail coat whether done by brush, broom, trowel, float or any other process including operation or machine for scoring floors, or any other purpose they may be used for in connection with the Cement Masons' Trade. The rodding, spreading and tamping of all concrete and the spreading and finishing of all top materials, sills, coping, steps, stairs, and risers and running all cement, and plastic materials 6" base or less shall be the work of the Cement Mason, all preparatory work on concrete construction to be finished, or rubbed, such as cutting of nails, wires, wall ties, etc. patching, brushing, chipping and bush hammering, rubbing or grinding if done by machine or carborundum stone of all concrete construction, setting of all strips, screeds, stakes and grades and curb forms. All glass set in cement. The pointing and patching and caulking around all steel or metal window frames that touch concrete. Also, the pointing and patching and caulking of all concrete including precast. The laying and finishing of Gypsum Material Roof. All dry packing, grouting and finishing in connection with setting all machinery such as engines, pumps, generators, air compressors, tanks, and so forth, that is set on concrete foundations. All prefabricated and prestressed concrete construction on the job site and in the shop, including the supervision of same, such as sidewalks, steps, floor slabs beams, joists, walls and columns, also the screeding, finishing, rubbing, grouting, pointing and patching of same. The curing of finished concrete, wherever necessary, whether by water, chemical compounds or otherwise, shall be part of the jurisdiction. Darbying, trowel finishing of all types oxychloride and epoxy floors, walls, etc. shall be the work of the Cement Mason; including all types of oxychloride granolithic or terrazzo composition floors, hand grinding, machine grinding or shot blasting ; the preparation of all subfloor surfaces, bonding; the preparation and installation of ground or base courses, steps, and cove base. The purpose and intent of the six-inch base law will not be defeated. All magnesite composition installation work of the O.P. & C.M.I.A. shall be done under the supervision of a competent and qualified Cement Mason.

   Section 1a. All types of maintenance and utility concrete work.

   Section 1b. No Local Union shall be allowed to use any influence to change the original specification on any job where cement base is specified. Plasterers must assist the Cement Mason/Plasterer in every way so the intent and purpose of the six-inch base law will not be defeated.

Section 1c.  Cement Masons claim the waterproofing of all work included in their jurisdiction, such as Thoroseal, Ironite, Plastedweld and any similar products, regardless of the tools used or methods of application, or color of materials used and regardless of the type of base these materials may be applied to.

Section 1d.  All Epoxy injection and all types of Crack Sealing shall be the work of the Cement Mason.

Section 1e.  The regulation of the size of the hand finishing trowel shall be a matter of local autonomy.

Section 1f.   When Local Unions with Cement Mason/Plasterer members are negotiating agreements with their Employers, the regulations governing the use of troweling machines should be made part of their agreements.

Section 1g.  No member of this Local Union, nor any member of any other Local Union of the O.P. & C.M.I.A. working in the jurisdiction of this Local Union, will be permitted to work upon any job where a floating machine or a troweling machine is being operated on any floor, sidewalk, loading dock or any other flat surface, no matter if cement, concrete or any other plastic material is being placed and finished, when such machine is used for the final operation, or when another Cement Mason, or Cement Masons, do not handfloat or handtrowel after each and every operation of such machine or machines.  The operation of such machines shall be the work of Cement Masons.

Section 1h.  All applied sports surfaces including playgrounds, tennis courts, running tracks etc. is the work of the cement mason.

Section 1i.   All pervious concrete, commercial, residential, utility, heavy and highway, shall be the jurisdiction of Cement Masons Local 592.  All preparation, set-up, pouring, placing, screeding, finishing, curing shall be the jurisdiction of Cement Masons Local 592.

Section 1j.  Concrete polishing and all aspects from preparation to finished product shall be the work of the cement masons.  all prep work, floor repair, sealing of cracks and joints, caulking, etc., and any work needed to get the surface ready for grinding and polishing shall be the work of the cement masons.  All toppings, coatings, decorative strips, control joints, in-lays will be done by the cement masons.  all grinding and polishing, from the lowest grit to the highest grit, including grinding, honing, densifying, polishing and burnishing, shall be done by the cement masons.  All decorative applications, saw cutting, staining, and sealing, etc. will be done by the cement masons.  Any grinding/polishing machine, whether it be a walk behind manual or seated and driven, including any grinding/polishing attachment to a seated and driven piece of equipment, shall be the work of the cement masons.

## PLASTERER JURISDICTION
### Jurisdiction of Work

Local 592 shall have full and exclusive work jurisdiction over the plastering, cement masonry and shop industries. The work jurisdiction shall include, but no be limited to, the supervision and performance of the production, installation and maintenance of all ceilings, floors, walls and of all cement construction of every description, kind and character. Local 592 shall be composed of journeypersons, apprentices and any other type of worker employed on any kind of work allied to or connected in any manner with the plastering, cement masonry, and shop industries.

Section 2.   The plasterer shall have jurisdiction over, but shall not be limited to:

(A)  All interior or exterior plastering of cement, stucco, stone imitation or any patent material when cast, the setting of same, also corner beads when stuck must be done by practical plasterers of the OP&CMIA.  This includes the plastering and finishing with hot composition material in vats, compartments or wherever applies; also the taping and pointing of all joints, nail holes and bruises on wallboard, and/or drywall, regardless of the type of materials or tools used; also the setting in place of plasterboard, ground blocks, patent dots, cork plates, brownstones, and acoustical tile including temporary nailing, cutting and fitting in connection with the sticking of same.

All acoustic blocks when stuck with any plastic materials, regardless of thickness, shall be the work of the plasterer only.  Also the sticking, nailing, and screwing of all composition caps and ornaments.  The preparing, scratching and browning of all ceilings and walls when finished with terrazzo, or tile shall be done by plasterers of this Association, allowing sufficient thickness to allow the applying of the terrazzo or tile and the application of any plastic material to the same must be done by members of the OP&CMIA who are practical plasterers.  The preparation, installation, and repair of all interior and exterior insulation systems and the fireproofing of all steel beams, columns, metal decks and vessels shall be the work of the plasterers.

(B)  Local unions shall have autonomy governing the mixing of all materials but shall not deviate from manufacturers' standards or the specifications of the American Standards Association.

(C)  All casting must be done by members of the OP&CMIA.  The applying of any plastic material to soffils, ceilings and perpendicular work, and the finishing, rubbing, polishing and cleaning, whether done by hand, machine, or any other method, is recognized as the work of the plasterer, except a base six inches or less.  This does not include such patching and brushing, covered in Section 4 of this Article.  No member of this Association shall be allowed to

work to any corner beads that are put on beams, arches or groin ceilings unless same are stuck by the plasterer. This includes window heads and door heads.

(D)  All cement plastering shall be supervised and executed by the plasterer on walls, over and above six (6) inch base.

(E)  Plasterers claim all waterproofing of work included in their jurisdiction, such as Thoroseal, Ironite, Plasterweld and any similar products, regardless of the tools used, or method of application, color of materials used and regardless of the type of base these materials my be applied to.

(F)  All casting, installing, finishing, rubbing and cleaning, whether by hand or machine, of all imitation stone shall be the work of the members of the OP&CMIA.

(G)  All mouldings run in place and all staff work, the making of templets and horsing of moulds in and or buildings must be made and produced by members to the OP&CMIA.  All mortar boards must be raised at least eighteen (18) inches above the scaffold.

(H)    Casting shall be permitted as follows:

    (1)  Domes that do not exceed two (2) feet in diameter may be cast.

    (2)  Niches may be cast and stuck in place providing they do not exceed two (2) feet in width and four (4) feet in length.

    (3)  Mouldings clustered with enrichment may be cast.

    (4)  Cornices may be cast where and when it is not practical to run in place with a mould.  This has reference principally to light troughs, etc. that require electrical wiring or reflectors inside, and this does not include block or similar mouldings that exceed six (6) feet in total length from mitre to mitre.

    (5)  Beams, columns, and pilasters shall not be cast unless they are totally enriched and have no members paralleling one another.

    (6)  On an alteration where the work which would ordinarily be run cannot be done without causing undue interference with the occupancy of the premises and undue delay in performance, it shall be permissible to case such work with the consent of the Local Union.

(7)  All small spandrels or panels under two feet, small caps and other similar work may be cast.

(8)  All caps not exceeding two feet in diameter may be cast.

(9)  Diminished fluted pilaster and columns or pilaster and columns with entasis may be cast.

(10) Small pattern ceilings of geometrical design:  coffered ceilings when panels do not exceed twenty-four inches at the ceilings or minor line and fifty-four inches at the bottom or major line may be cast.

## SKIM OR GLAZE COATING

A. Taping and pointing of all joints, nailholes, and bruises on wallboard and/or drywall, regardless of the type of materials or tools used and all other wall and ceiling surfaces.

B. The surface produced by the application of the same pointing material as used in the pointing and taping of the joints, regardless of the material used, to the entire wallboard and/or drywall surface for the purpose of producing a uniform surface compatible with the pointed and taped joints and the pointing and taping in connection therewith.

C.  The gauging and/or mixing of all materials used in the patching and plastering of joints and imperfections in the wallboard and/or drywall.

D.  the gauging and/or mixing of the materials for the application of "skim coat" or "glaze coat" plastering or imitation acoustical finishes.

E.  Plasterers of Local #592 shall perform all work listed above and all work or processes which represent technological change, replacement, modifications or substitution for the work described above.

## APPENDIX A
### TERRITORY JURISDICTION

**PHILADELPHIA AREA 592**
Philadelphia County
Bucks County
Chester County
Delaware County
Montgomery County

**ALLENTOWN AREA 233**
Lehigh County
Carbon County
Northampton County
Schuylkill  County (plasterers only)

**READING AREA 105**
Berks County

**SCRANTON/WILKES-BARRE/WILLIAMSPORT  100**
Lackawanna County
Luzerne County
Wyoming County
Susquehanna County
Bradford County
Sullivan County
Tioga County
Lycoming County
Union County
Wayne County
Pike County
Monroe County
Columbia County

**HARRISBURG AREA 94**
Dauphin County
Lebanon County
Northumberland County
Montour County
Snyder County
Juniata County
Perry County
Cumberland County
Franklin County
Fulton County
Schuylkill Co. (cement masons only)

**YORK AREA 107**
York County
Lancaster County
Adams County
Berks County (Plasterers only)

**DELAWARE AREA 36**
State of Delaware

**CAMDEN, NJ AREA 699**
Camden County
Gloucester County
Salem County

**MARYLAND AREA 36**
Cecil County

**ATLANTIC CITY, NJ AREA 33**
Ocean County
Atlantic County
Cape May County
Cumberland County

**TRENTON, NJ AREA  5**
Burlington County
Mercer County
Hunterdon County
Somerset County
Monmouth County
Middlesex  County
Union County

# INDEPENDENT CONTRACTORS AGREEMENT
## WITH
## PLASTERERS AND CEMENT MASONS UNION LOCAL NO. 592

PLASTERERS AND CEMENT MASONS UNION, LOCAL NO. 592 ("Union") and the Undersigned Employer agree that:.

1. The Employer hereby recognizes the Union as the sole and exclusive collective bargaining representative of all of its employees performing work within the work geographic jurisdiction of the Union.

2. The Employer shall be, and is hereby, bound by all of the terms and conditions of employment contained in the attached Independent Contractor's agreement between the Union and the Employer governing the Employees' terms and conditions of employment in each of the particular geographic areas where the below-named Employer shall hereinafter perform work within the Union's work jurisdiction that are effective on the date of this Agreement, as well as, any additions, modifications, extensions and renewals thereof as may occur subsequent to the execution of this Agreement in accordance with the process described therein.

3. This agreement shall be effective as of the date set forth below and shall remain in full force and effect as provided within the above-described collective bargaining agreement with the Union.

PLASTERERS AND CEMENT MASONS
UNION, LOCAL UNION NO. 592

By: _Mike Fera_

    **MIKE FERA**
    **PRESIDENT/BUSINESS MANAGER**

DATE: _10-3-08_

PHONE NO. _856-783-3741_

CELL NO. _856-207-1995_

FAX NO. _856-783-3742_

EIN# _____

This Agreement cannot be altered.

_Pine Valley_
**NAME OF COMPANY**

_Scott Skuzwsky_
**PRINT Full Name of Employer**

_[signature]_
**SIGNATURE OF AUTHORIZED**
**EMPLOYER REPRESENTATIVE**

_74 Century Clos Rd._
**ADDRESS**

_Pine Hill, NJ 08021_
**CITY    STATE    ZIP CODE**

73350-1